UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ELLINGSON DRAINAGE, INC.,** <br><br> **Plaintiff,** <br><br> v. <br><br> **UNITED STATES FISH & WILDLIFE SERVICE, et al.,** <br><br> **Defendants.** | Civil Action No. 25-541 (JDB) |

### MEMORANDUM OPINION

Plaintiff Ellingson Drainage Inc. operates a drain tile business in the upper Great Plains, installing subsurface pipes to aerate oversaturated soil for agricultural use. The United States Fish and Wildlife Service (the "Service") holds conservation easements over numerous small wetlands in the region. By selling these easements to the Service, landowners (many of whom are Ellingson's potential clients) have agreed not to drain the wetlands. Naturally, these prohibitions erect a barrier to landowners and Ellingson alike.

In 2024, the Service promulgated a regulation providing landowners guidance on how to install drain tile without risking legal liability for any resulting drainage. According to Ellingson, this regulation did more than provide landowners a roadmap for avoiding legal action; it cost Ellingson business. So Ellingson filed this lawsuit under the Administrative Procedure Act ("APA"), asserting that the regulation is arbitrary and capricious or otherwise not in accordance with law.

Yet Ellingson's complaint is primarily about the rule's preamble, and Ellingson fails to adequately show that the preamble is reviewable or that the claim is ripe. Ellingson also lacks pocketbook or pre-enforcement standing to challenge the preamble and fails to demonstrate

1

procedural or informational injury. The Court will therefore grant defendants' motion to dismiss the complaint for lack of reviewability, ripeness, and standing.

## BACKGROUND

### I.  Prairie Pothole Conservation Easements

At the root of this lawsuit is Congress's effort to protect migratory birds and the habitats they rely on. In 1929, Congress authorized the Secretary of the Interior "to acquire land 'for use as inviolate sanctuaries for migratory birds.'" North Dakota v. United States, 460 U.S. 300, 302 (1983) (quoting the Migratory Bird Conservation Act, 45 Stat. 1222, ch. 257, 16 U.S.C. § 715 et seq.). The funds for these purchases came from the proceeds from the sale of so-called duck stamps, hunting stamps that federal law required waterfowl hunters to purchase. Id.; see 16 U.S.C. §§ 718a, 718d.

In 1958, Congress expanded the types of property interests the Secretary could purchase with duck stamp funds to include not only fee interests, but also wetland easements that "prohibit[] fee owners from draining their wetlands or otherwise destroying the wetlands' suitability as breeding grounds." North Dakota, 460 U.S. at 302-03; see Pub. L. 85-585, § 3, 72 Stat. 487, 16 U.S.C. § 718d(c).[1] These easements are "voluntary legal agreement[s]" between landowners and the National Wildlife Refuge System Administration (the "Administration") "that pay[] landowners to permanently protect wetlands." Nat'l Wildlife Refuge Sys.; Drain Tile Setbacks, 89 Fed. Reg. 41,336, 41,336 (May 13, 2024).[2] While the particular terms of these contracts may differ, all landowners "agree that wetlands protected by [the] easement cannot be drained, filled, leveled, or burned." Id.; see Minimally Restrictive Conservation Easement Acquisitions § 6.3(A),

---

[1] In 1961, Congress appropriated funds beyond duck-stamp proceeds to be used to purchase wetland easements. North Dakota, 460 U.S. at 303; see Wetlands Act of 1961, Pub. L. 87-383, 75 Stat. 813.

[2] The National Wildlife Refuge System is administered through the Service. 16 U.S.C. § 668dd(a)(1).

2

U.S. Fish & Wildlife Serv., https://www.fws.gov/policy-library/341fw6 [https://perma.cc/QHC4-B5DF] (last visited Oct. 7, 2025) (explaining that wetland easements are "minimally restrictive conservation easements" that "take few rights away from the property owner," by for example prohibiting her "from destroying the wetlands," while still permitting her "to use the property for grazing or haying").

"The principal waterfowl breeding grounds in the continental United States are located in four States of the northern Great Plains—North Dakota, South Dakota, Minnesota, and Montana." North Dakota, 460 U.S. at 304. This region is known as the Prairie Pothole Region. 89 Fed. Reg. at 41,336. "Prairie potholes are freshwater depressions and marshes, often less than 2 feet deep and 1 acre in size, that are a permanent feature of these landscapes barring deliberate alteration of the topography or hydrology." 89 Fed. Reg. at 41,336. These wetlands make the Region "responsible for producing approximately 50 to 75 percent of the primary species of ducks on the North American continent, providing habitat for more than 60 percent of the breeding population." Id. As a result, the Administration owns wetland easements "over many prairie potholes" across the Region. Compl. [ECF No. 1] ¶ 18; see also North Dakota, 460 U.S. at 305 (explaining that "between 1961 and 1977" North Dakota "consented to the acquisition of easements covering approximately 1.5 million acres of wetlands").

## II.    Drain Tile and Regulation

Although the Prairie Pothole Region's natural water can be a boon for ducks, it can be an impediment for farmers. Put simply, crops don't like water-soaked soil. So farmers use subsurface drainage systems to remove water from "poorly drained soils with the goal of improving soil aeration." 89 Fed. Reg. at 41,337; see Compl. ¶ 1. Modern subsurface drainage systems—known

3

as drain tile—"remove water through perforated pipe . . . placed below the soil surface." 89 Fed. Reg. at 41,337.

Considering that drain tile removes water, it's unsurprising that it can pose a risk to the prairie potholes over which the Administration holds easements. See id. If placed "adjacent to wetland areas" (and subject to many other factors), drain tile can directly or indirectly drain a wetland area. See id. (explaining that the effect of drain tile depends not only on its location and depth, but the "soil properties, topography . . . [and] the relation between the wetland area and groundwater"). So, if not careful, a landowner attempting to aerate his farmland may violate the terms of his easement contract, see id., or even face criminal penalties, see 16 U.S.C. § 668dd(c), (f)(2).

In 2020, the Service issued a memorandum to help decrease some of the uncertainty regarding drain tile around wetland easements. See U.S. Fish and Wildlife Serv., Drain Tile Setbacks and Legal Action on U.S. Fish & Wildlife Serv. Wetland Easements (Feb. 26, 2020) ("Guidance Memo"), [https://perma.cc/F53N-YGAQ]. The Guidance Memo explains that the Service will determine the permissible location of drain tile by using the "van Schilfgaarde equation" to calculate a "setback distance." Id. at 1. It also provides a safe harbor for landowners: if "the landowner coordinates their tile planning with the Service, and adheres to Service-provided setback distances, the Service will not pursue legal action if it is later determined that the distances are inadequate to protect wetland areas." Id. On the flip side, if a landowner does not coordinate with the Service, "and drainage of the protected wetland occurs," the Service will "request that the tile" be removed, and if the landowner does not comply, the Service "will review its legal obligations . . . includ[ing] seeking redress via legal action," but only after "the opportunity for administrative appeal." Id. at 1-2. In short, the Guidance Memo recognizes that "placement of

4

any structure that diverts surface or subsurface water away from the purchased easement wetland area and results in water starvation of that wetland . . . would violate the provisions of the wetland easement," while providing landowners with a way to avoid legal liability. Id. at 1.

That brings us to the regulation at issue here. In 2024, the Service issued a regulation (the "2024 Rule" or "Rule") to "codify the process by which landowners can request and the Service will provide drain tile setbacks under wetland easement contracts." 89 Fed. Reg. at 41,336. The Rule, codified at 50 C.F.R. § 25.24, states that "[u]pon the request of a landowner . . . the Service will provide setback distances for the placement of drain tile on lands covered by wetland easements" using "the best available science." § 25.24(b). And "[w]hen a landowner coordinates tile planning with the Service . . . the Service will not seek legal redress if it is later determined that the drain tile setback distances provided by the Service failed to protect the wetland areas from drainage." § 25.24(c). In codifying this process, the Service explained that the Guidance Memo is "incorporated as part of the broader internal guidance" and thus "remains in full effect." 89 Fed. Reg. at 41,337. The Service also noted in the regulation's preamble that the regulation distinguished wetland easements from provisions of law that "allow drain tile to have a 'minimal effect' to wetlands," explaining that "wetland easement agreements with landowners" permit "no effect." Id. Thus, "it is a violation of the easement contract if the result is that the tile drains a protected wetlands area," but a landowner may avoid liability for such violation through the regulation's safe harbor. Id.

### III. Procedural History

Ellingson "provides construction planning, design, and installation services," including drain tile, to farmers in the Prairie Pothole Region. Compl. ¶¶ 1-2. The company alleges that the 2024 Rule "has resulted in Ellingson losing business," "[b]ecause the Service purports to allow

5

'no effect' on its wetland easements." Id. ¶ 39-42. So Ellingson brought this lawsuit against the Service, the Department of the Interior, and relevant leadership.[3] The complaint asserts two claims under the APA, contending that the Rule is "arbitrary, capricious, or otherwise not in accordance with law," and seeking vacatur of the Rule and related prospective relief. Id. ¶¶ 45-61; see 5 U.S.C. § 706(2). The first claim is that, "[b]y stating that drain tiles must have 'no effect,' the Rule goes beyond protecting wetlands, or the Service's easement rights, and advances an interpretation that is inconsistent with traditional norms of real property conveyance." Id. ¶¶ 45-57. The second claim is that the Service failed to engage in "reasoned administrative decision-making" because, "[u]nlike the 2020 Guidance," which stated the Service would use the van Schilfgaarde equation to determine setback distance, "the 2024 Rule does not set out a standard for calculating drain tile setbacks." See id. ¶¶ 58-61, 36. Defendants have moved to dismiss Ellingson's complaint for lack of subject matter jurisdiction. Defs.' Mot. Dismiss [ECF No. 16] ("Mot."); Fed. R. Civ. P. 12(b)(1); see also Pl.'s Resp. Opp'n Def.'s Mot. Dismiss [ECF No. 18] ("Opp'n"); Defs.' Reply in Supp. Mot. Dismiss [ECF No. 20] ("Reply").

## DISCUSSION

Defendants argue that the Court must dismiss Ellingson's complaint because Ellingson's claim is unreviewable and unripe and because Ellingson lacks standing.[4] The Court agrees. Ellingson primarily challenges the unreviewable preamble, which claim is relatedly unripe. Even if Ellingson's challenge to the preamble were reviewable and ripe, it fails to demonstrate

---

[3] Ellingson sues Matt Hogan, the Regional Director of the Mountain-Prairie Region of the Service, Will Meeks, the Regional Director of the Midwest Region of the Service, and Doug Burgum, the Secretary of the Department of the Interior. Compl. ¶¶ 10-15.

[4] The Service only belatedly raises its ripeness argument in its reply, but there is no forfeiture problem because jurisdictional issues may be raised at any time. See, e.g., Wilkins v. United States, 598 U.S. 152, 157 (2023).

pocketbook or pre-enforcement standing as to the alleged injury suffered from the preamble. And its procedural and informational theories of standing fail as well.

## I. Reviewability and Ripeness

Under the APA, judicial review is generally available only for "final agency action." Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys., 603 U.S. 799, 808 (2024) (quoting 5 U.S.C. § 704). A final agency action is one that "marks the consummation of the agency's decisionmaking process" and one "by which rights or obligations have been determined, or from which legal consequences will flow." Id. (quoting Bennett v. Spear, 520 U.S. 154, 177-78 (1997)). "While preamble statements may in some unique cases constitute binding, final agency action susceptible to judicial review, this is not the norm." Nat. Res. Def. Council v. EPA, 559 F.3d 561, 564-65 (D.C. Cir. 2009) (citing Kennecott Utah Copper Corp. v. Dep't of Interior, 88 F.3d 1191, 1222-23 (D.C. Cir. 1996)).

That is because "the 'real dividing point' between the parts of a final rule with and without legal force is designation for 'publication in the Code of Federal Regulations.'" AT&T Corp. v. FCC, 970 F.3d 344, 350 (D.C. Cir. 2020) (quoting Brock v. Cathedral Bluffs Shale Oil Co., 796 F.2d 533, 539 (D.C. Cir. 1986) (Scalia, J.)). Where "there is a discrepancy between the preamble and the Code, it is the codified provisions that control." Id. at 351. Thus, where the preamble "purports to establish the regulatory treatment" of a certain issue "but the regulations as published in the Code do not, then the preamble statement is a nullity." Id. (citing Nat. Res. Def. Council, 559 F.3d at 565). Under Kennecott, "reviewability hinges on whether the preamble has independent legal effect, which in turn is a function of the agency's intention to bind either itself or regulated parties." 88 F.3d at 1223. Even without an "express statement," courts may "infer that the agency intended the preamble to be binding if what it requires is sufficiently clear." Id.

7

However, "[w]here the agency characterizes its action as non-binding" the Circuit has "found the action unreviewable," although that characterization can be overcome by other indicia of "binding effect." Tozzi v. HHS, 271 F.3d 301, 310 (D.C. Cir. 2001) (quotation omitted).

Moreover, courts "lack authority to review claims under the APA 'where an agency merely expresses its view of what the law requires of a party, even if that view is adverse to the party.'" Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin., 452 F.3d 798, 808 (D.C. Cir. 2006). And agencies may also issue interpretive rules "to advise the public of the agency's construction of the statutes and rules which it administers." Nat'l Council for Adoption v. Blinken, 4 F.4th 106, 114 (D.C. Cir. 2021) (quoting Perez v. Mortgage Bankers Ass'n, 575 U.S. 92, 97 (2015)). "[A]n interpretive rule explains 'pre-existing legal obligations or rights' rather than 'creat[es] legal effects.'" Id. (quoting Nat. Res. Def. Council v. Wheeler, 955 F.3d 68, 83 (D.C. Cir. 2020)).

Here, Ellingson primarily takes issue with the preamble text stating that, unlike provisions in the Food Security Act of 1985, "which allow drain tile to have a 'minimal effect' to wetlands," the "Service wetland easement agreements with landowners include provisions that allow for no effect." Compl. ¶¶ 35, 41-42, 50; Opp'n at 8, 12-15; 89 Fed. Reg. at 41,337. In Ellingson's view, this new and narrower reading of the easements constrains its ability to do business in the region. Compl. ¶¶ 41-42. But in the Rule's preamble, the Service is simply expressing its view of what the preexisting easement agreements permit—as already interpreted in the Guidance Memo—not creating new legal obligations that flow from the Rule itself. See Guidance Memo at 1 ("When an easement is purchased, the Service must advise landowners that placement of any structure that diverts surface or subsurface water away from the purchased easement wetland area and results in water starvation of that wetland, essentially drainage, would violate the provisions of the wetland

easement."). The Service also disclaims that the "no effect" language is binding. See Reply 6. Thus, Ellingson fails to overcome the norm that preamble text is unreviewable.

In cases challenging normally unreviewable agency action "the issues of reviewability and ripeness converge." Fla. Power & Light Co. v. EPA, 145 F.3d 1414, 1420 (D.C. Cir. 1998) (quoting Kennecott, 88 F.3d at 1223). Ripeness requires courts "to evaluate both the fitness of the issues for judicial review and the hardship to the parties of withholding court consideration." Abbott Labs. v. Gardner, 387 U.S. 136, 149 (1967). In Kennecott, the court distinguished preamble language that "represent[ed] an interpretation of an identified statutory provision, []or a clarification of an otherwise binding regulation" from "hypothetical and non-specific" guidance that was "not crafted as a concrete rule that can be applied under identified circumstances." 88 F.3d at 1223.

Granted, the preamble text here is a clarification of the Service's interpretation of the preexisting easement agreements. However, the Kennecott court went on to explain that plaintiffs must demonstrate "a direct and immediate rather than a distant and speculative impact." Id. (citing Abbott Labs., 387 U.S. at 152-53). The court continued:

> We must await a concrete case where we can probe the limits of the rule in the context of a live controversy involving actual events. Unless and until [the agency] invokes the preamble in an attempt to affect the outcome of a real dispute, there is little need for and no factual basis to inform our inquiry into its validity. Moreover, by awaiting a concrete case, we will then be able to ascertain with assurance that [the agency] intended to bind a party and that the party was thereby aggrieved.

Id.; see also Fla. Power & Light Co., 145 F.3d at 1421 (rejecting challenge to preamble as unreviewable and unripe because agency had "yet to issue or defend a formal order applying this rule"); Nat. Res. Def. Council, 559 F.3d at 565 (rejecting challenge to preamble as unreviewable and unripe because it was "uncertain" how the agency would "use or rely on or interpret what it said in the preamble"); Clean Air Implementation Project v. EPA, 150 F.3d 1200, 1208 (D.C. Cir.

9

1998) (rejecting challenge to preamble as unripe where agency claimed statements "were no more than an interpretation" and there was no evidence of a "direct and immediate effect" (citation modified)). So, too, here, where there is no indication yet that the Service would rely on its Rule preamble—as opposed to the easement agreements—in any future enforcement action. Thus, Ellingson's claim is unripe as well as unreviewable.

## II.     Pocketbook Standing

Even if Ellingson's claim were reviewable and ripe, it also lacks standing to challenge the preamble text because its injury is not certainly impending and it has failed to adequately allege causation and redressability.

Article III limits federal jurisdiction to "Cases" and "Controversies." Art III, § 2, cl. 1. A lawsuit is only a case "within the meaning of Article III" if the plaintiff demonstrates it has "standing to sue." Diamond Alt. Energy, LLC v. EPA, 145 S. Ct. 2121, 2133 (2025). At its core, standing asks "a basic question—'What's it to you?'" Id. (quoting FDA v. All. for Hippocratic Med., 602 U.S. 367, 379 (2024)). Ensuring that a plaintiff has a personal stake in the litigation that the court can redress limits the federal judiciary to its intended, limited role. Id. Standing breaks down into three requirements: a plaintiff must have (1) an injury in fact that is likely (2) caused by the defendant and (3) redressable by the relief requested. See id. To survive a motion to dismiss, a complaint must adequately allege all three requirements, and a reviewing court must accept as true all well-pleaded allegations. See Food & Water Watch, Inc. v. Vilsack, 808 F.3d 905, 913 (D.C. Cir. 2015); Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992).

Here, Ellingson fails to satisfy all three standing requirements. As to injury in fact, the complaint states that Ellingson has "los[t] business," and specifies that "at least one farmer" who had expressed an interest in having Ellingson install drain tiles on his property "later inform[ed]

10

Ellingson that he could not install drain tiles because of the Service's recommended drain tile setbacks on his property." Compl. ¶¶ 39-40. Alleged monetary harm is "of course an injury." Diamond Alt. Energy, 145 S. Ct. at 2135 (quoting United States v. Texas, 599 U.S. 670, 676 (2023)); see Texas, 599 U.S. at 688 (Gorsuch, J., concurring in the judgment) ("[E]ven one dollar's worth of harm is traditionally enough to qualify as concrete injury under Article III." (citation modified) (collecting cases)). However, the unripeness of Ellingson's claim also means that its injury is not "certainly impending." See Nat'l Treasury Emps. Union v. United States, 101 F.3d 1423, 1427 (D.C. Cir. 1996) (citations omitted).[5]

The trouble continues with causation and redressability. Causation and redressability "are usually 'flip sides of the same coin.'" Diamond Alt. Energy, 145 S. Ct. at 2133 (quoting All. for Hippocratic Med., 602 U.S. at 380). That is because, as relevant here, "[i]f a defendant's action causes an injury, enjoining the action . . . will typically redress that injury." All. for Hippocratic Med., 602 U.S. at 381. These requirements are generally easy to satisfy when the plaintiff is the object of government action. Id. at 382. But when a plaintiff challenges the government's unlawful regulation "of someone else, standing is . . . substantially more difficult to establish." Id. (quoting Lujan, 504 U.S. at 562). That's because the causal chain between the government's action and the plaintiff's injury is dependent upon actions of third parties. Id. at 383.[6]

---

[5] Defendants contend that Ellingson does not allege an injury in fact because Ellingson "is not the object of, and is thus not regulated by" the Rule, and because the Rule "compels no participation" and thus cannot have harmed Ellingson. Mot. at 9-11. But these arguments really go to causation and redressability. See, e.g., Diamond Alt. Energy, 145 S. Ct. at 2135-36 (explaining that lost business is a sufficient injury in fact and that the difficulty for plaintiffs who are not objects of regulation comes at causation and redressability).

[6] "In cases of alleged future injuries to unregulated parties from government regulation, the causation requirement and the imminence element of the injury in fact requirement can overlap. Both target the same issue: Is it likely that the government's regulation or lack of regulation of someone else will cause a concrete and particularized injury in fact to the unregulated plaintiff?" All. for Hippocratic Med., 602 U.S. at 385 n.2. Thus, the problem with causation also bears on failure to show imminent injury.

Defendants and Ellingson debate whether Ellingson is an object of the 2024 Rule. Defendants argue that landowners, not drain-tile installers, are the objects of the regulation. Mot. at 9. Ellingson counters that, "[e]ven if the rule is 'technically directed at' farmers," Ellingson is still an object of the regulation because it "prevents their product from being used." Opp'n at 13 (quoting Energy Future Coal. v. EPA, 793 F.3d 141, 144 (D.C. Cir. 2015)). In Diamond Alternative Energy, the Supreme Court discussed—but stopped short of adopting—the theory that "when a regulation targets the provider of a product or service by limiting another entity's use of that product or service, the targeted provider ordinarily has standing." 145 S. Ct. at 2136. There, California regulations required automakers to manufacture more electric and fewer gasoline-powered vehicles. Id. at 2129. Fuel producers argued that California was "targeting the use of gasoline . . . by regulating at the assembly line rather than the gas pump," and the Court found that argument to be "not without force." Id. at 2136. By contrast, there is simply no indication here that the Rule is "seek[ing] to indirectly target," id., drain-tile installers.

And even assuming an upstream supplier is the object of a regulation that bars another party's use of its products, the Rule does no such thing. Recall that the Rule layered onto a preexisting legal regime that included the easement contracts—which bar landowners from draining wetlands—and the Guidance Memo—which gave landowners a safe harbor for drain tile installation. Under that regime, landowners were not barred from placing drain tile; rather, they were put to a choice: collaborate with the Service and receive a safe harbor from legal liability, place drain tile independently and run the risk of legal sanction, or skip drain tile altogether. See Nat'l Ass'n of Home Builders v. EPA, 667 F.3d 6, 14 (D.C. Cir. 2011) (holding that plaintiff lacked standing to challenge agency determination where plaintiff faced "the same statutory and regulatory alternatives" as before the determination).

12

Ellingson rightly does not contend that the Rule spares landowners this choice. See 50 C.F.R. § 25.24 (maintaining safe harbor); 89 Fed. Reg. at 41,337 (explaining that the Guidance Memo remains in effect, and that the Rule "codifies the key aspects of it"). Nor does Ellingson's complaint allege that the business it has lost is due to the Rule rather than the legal regime already in place. The complaint states that the landowner who told Ellingson he could not go forward with drain tile installation said that "he could not install drain tile because of the Service's recommended drain tile setbacks on his property." Compl. ¶ 40 (emphasis added); see Decl. of Levi Otis [ECF No. 18-1] ¶ 12 ("I am aware that three clients in North Dakota decided against tiling . . . due to the presence of . . . conservation easements on the parcels."). The Service provided recommended drain tile setback distances prior to the Rule. See Guidance Memo. Ellingson does not allege that the Service has become stricter with its setbacks since the Rule.[7] As a result, it is not clear that Ellingson would be any better off than it is now if the Court vacated the Rule. Landowners would still be restrained by the easement contracts and would still be put to the choice of whether to seek safe harbor under the Guidance Memo. In short, Ellingson offers nothing beyond "guesswork" to contend that vacating the Rule would result in landowners being more willing to install drain tile. Hecate Energy LLC v. FERC, 126 F.4th 660, 666 (D.C. Cir. 2025).

This case is also otherwise distinguishable from Diamond Alternative Energy, where the Supreme Court held that fuel producers suffered redressable upstream economic injuries caused by California's automobile regulations even if they were not the object of those regulations. See 145 S. Ct. at 2136-38. "When the plaintiff is not the object of a government regulation," the court "must conclude that 'third parties will likely react' to the government regulation (or judicial relief)

---

[7] Indeed, Ellingson admits that it has not received the Service's recommended setback distances for the lands in question. See Decl. of Levi Otis Ex. A [ECF No. 18-1] at 5-6, 8 (providing maps of wetland easements on landowner property and explaining that customers have decided not to go forward with drain tile even though no setback distances from the Service have been received).

13

'in predictable ways' that will likely cause (or redress) the plaintiff's injury." Id. at 2134 (quoting All. for Hippocratic Med., 602 U.S. at 383).

There, the Court emphasized that "commonsense economic principles" supported the fuel producers' theory that requiring automakers to make more electric vehicles and fewer gasoline-powered ones would depress sales of gasoline and that invalidating the regulations would redress that injury. Id. at 2136-37. The Court also highlighted four pieces of record evidence that supported standing. First, fuel producer declarations explained that California's regulations historically decreased fuel purchases and that California itself estimated and asserted that fuel demand would fall. Id. at 2137. Second, California's own expert declarations said much the same. Id. at 2137-38. Third, the EPA agreed. Id. at 2138. Fourth, five electric vehicle automakers predicted that absent the regulations other automakers would shift back to gasoline-powered vehicles. Id.

Here, commonsense economic principles do not link the Rule to Ellingson's alleged injury because the Rule preserves the existing legal regime. See Neighbors Opposing Pit Expansion, Inc. v. New Richmond Dev. Corp., No. 20-cv-91, 2025 WL 2780811, at *7 (S.D. Ohio Sept. 30, 2025) (denying reconsideration after Diamond because the "pre-existing coal ash pollution" was not "fairly traceable" to the defendant's challenged action). Moreover, there is no such extensive record evidence. Ellingson's Director of Government Affairs, Levi Otis, avers only that it is his "understanding that the Service's interpretation of the conservation easements—as reflected in the Rule—has resulted in lost business for Ellingson." Decl. of Levi Otis ¶ 11. And granted, the Court in Diamond Alternative Energy made clear that parties need not secure "affidavits either from expert economists or from directly regulated [parties]." 145 S. Ct. at 2139. But they must "'show a predictable chain of events' that would likely result from judicial relief and redress the plaintiff's

14

injury." Id. (quotation omitted). Merely "conclusory statements . . . are insufficient to state a plausible basis for standing." Williams v. Lew, 819 F.3d 466, 472 (D.C. Cir. 2016).

In sum, Ellingson has failed to show that the "third part[y] [landowners] will likely react to the [Service's] regulation (or judicial relief) in predictable ways that will likely cause (or redress)" Ellingson's injury. Diamond Alt. Energy, 145 S. Ct. at 2134 (citation modified). Unlike the regulations in Diamond to "force automakers to manufacturer more electric vehicles and fewer gasoline-powered vehicles," id. at 2136, the Rule here simply codifies the guidance's setback and safe-harbor processes, which in turn clarify and refine the preexisting legal rights and duties under the easement agreements. And unlike the declarations in Diamond from the suing parties, federal regulator defendant, and state regulator intervenor, as well as motions to intervene from parties that stood to benefit from the regulation, here we have only a conclusory declaration from the suing party. Accordingly, Ellingson has failed to establish pocketbook standing.

### III.     Pre-Enforcement Standing

Turning away from its alleged economic harm, Ellingson argues in its opposition that "it has standing because it faces increased legal exposure for installing drain tiles" from the Service's new interpretation in the preamble. Opp'n at 13-14. While Ellingson could not face direct liability under the easement contracts, Ellingson observes that "the Service has [criminally] prosecuted farmers for alleged violation of its easements," and that "the federal government prosecutes those that aid and abet crimes in the same manner as the one who commits the crime." Id.

It is true that a threat of prosecution can be a sufficient injury in fact to support a claim under the APA. See ITServe Alliance v. DHS, 71 F.4th 1028, 1034 (D.C. Cir. 2023). Yet that does not save Ellingson. First off, Ellingson's complaint is silent as to any threat of prosecution, and "it is axiomatic that a party may not amend his complaint through an opposition brief." Singh

15

v. District of Columbia, 55 F. Supp. 3d 55, 70 (D.D.C. 2014) (citation modified).  And even if Ellingson's opposition could work around that rule, Ellingson's opposition alleges no facts that show there is a "sufficiently imminent" threat that the government will prosecute it in light of the Rule.  ITServe Alliance, 71 F.4th at 1034; Nat'l Ass'n of Home Builders, 667 F.3d at 14.

Ellingson "cites no history of enforcement against drain installers for aiding and abetting," Reply 4, and alleges no facts that indicate that the government would have Ellingson in its cross hairs were it to undertake said prosecutions.  "Without an . . . allegation that the [Rule] substantially increased the risk of . . . enforcement" against drain-tile installers, the Court has "no basis to conclude the [Rule] caused a 'concrete and particularized' and 'actual or imminent' threat to any landowner, let alone" specifically to Ellingson.  Nat. Ass'n of Home Builders, 667 F.3d at 14 (quoting Lujan, 504 U.S. at 561); cf. Conf. Grp., LLC v. FCC, 720 F.3d 957, 963 (D.C. Cir. 2014) ("[M]erely foreseeable future litigation resulting from a[n] . . . interpretation that an agency has adopted is alone . . . too speculative to satisfy Article III's injury-in-fact requirement." (internal quotation marks omitted)).

### IV.    Procedural and Informational Standing

Finally, Ellingson contends that, if it does not have standing to challenge the Rule's preamble, it still has standing to challenge the Rule on the basis that the Rule "fail[s] to articulate a standard for calculating drain tile setbacks."  Opp'n at 15.  Ellingson contends that this makes the Rule arbitrary and capricious, giving Ellingson what it frames as both a procedural injury and an informational injury.  See id. at 15-16.  And those injuries, Ellingson argues, require the Court to engage in a more permissible causation inquiry.

Unfortunately for Ellingson, neither theory of injury works.  Starting with procedural injury, Ellingson does not allege that the Service violated any procedural requirement—such as

16

foregoing notice and comment or a reporting requirement—when it promulgated the Rule. See, e.g., Summers v. Earth Island Inst., 555 U.S. 488, 496 (2009); WildEarth Guardians v. Jewell, 738 F.3d 298, 305 (D.C. Cir. 2013). Rather, Ellingson alleges that the substance of the Rule is lacking. See Compl. ¶ 60. Similarly, Ellingson does not allege an informational injury. A plaintiff can only rely on the deprivation of information as an injury if it can point to "a statute . . . [that] requires that the information 'be publicly disclosed.'" Ethyl Corp. v. EPA, 306 F.3d 1144, 1148 (D.C. Cir. 2002). Ellingson points to no such statute, and thus cannot rely on informational injury to supply it with constitutional standing.

## CONCLUSION

The Court does not doubt that Ellingson's business may be affected by the restrictions the wetland easements place on drain tile. But Ellingson's complaint fails to adequately allege that the preamble text that it primarily challenges is reviewable or that its claim is ripe. Ellingson has also failed to show that it has standing under that theory or under its alternative theories. The Court will thus grant defendants' motion to dismiss the complaint for lack of jurisdiction.[8] A separate Order shall issue.

/s/
JOHN D. BATES
United States District Judge

Dated: October 15, 2025

---

[8] In its opposition, Ellingson asks in the alternative for the Court to grant it leave to amend its complaint. Opp'n at 17. Yet Ellingson did not include a proposed amended complaint, as required by Local Civil Rule 7(i), nor does it otherwise detail "how the amended complaint would differ from the original complaint." See Edwards v. Wilkinson, 233 F. Supp. 2d 34, 38 (D.D.C. 2002). The Court therefore denies Ellingson's request. Id. The complaint will, however, be dismissed without prejudice. N. Am. Butterfly Assoc. v. Wolf, 977 F.3d 1244, 1253 (D.C. Cir. 2020) ("[A] dismissal for want of subject-matter jurisdiction can only be without prejudice."); Fed. R. Civ. Pro. 41(b).